Jack GREEN, Individually and as Trustee, Lawrence P. Belden, Trustee, and Stanley Simon, Trustee, Plaintiffs,

v.

FUND ASSET MANAGEMENT, L.P., Merrill Lynch Asset Management, L.P., Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Princeton Services, Inc., Arthur Zeikel, Terry K. Glenn, Munienhanced

Bruce I. Goldstein, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, Laurence M. Johnson, Kirsten Nelson Callahan, Brenda Buan, Mahoney, Hawkes & Goldings, Robert E. Sullivan, Beverly Gudanowski, Sullivan Weinstein & McQuay, P.C., Boston, MA, for Plaintiffs.

Paul A. Rowe, Alan S. Naar, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP, Woodbridge, NJ, James N. Benedict, Mark Holland, Sean M. Murphy,

Mary K. Dulka, Clifford Chance Rogers & Wells LLP, New York City, for Defendants Fund Asset Management, L.P., Merrill Lynch Asset Management, L.P., Merrill Lynch & Co., Inc, Merrill Lynch, Pierce, Fenner & Smith Inc., Princeton Services, Inc., Arthur Zeikel, and Terry K. Glenn.

Robert J. Del Tufo, Frank E. Derby, Skadden, Arps, Slate, Meagher & Flom LLP, Newark, NJ, for Defendants Muni-Enhanced Fund, Inc., MuniVest Fund II, Inc., MuniYield Fund, Inc., MuniYield Insured Fund, Inc., MuniYield Insured Fund II, Inc., MuniYield Quality Fund, Inc., and MuniYield Quality Fund II, Inc.

## OPINION

DEBEVOISE, Senior District Judge.

This matter is before the court on defendants' motions for summary judgment and on plaintiffs' cross-motion for partial summary judgment on liability. For the reasons that follow, the plaintiffs' cross-motion shall be denied, the defendants' motions for summary judgment shall be granted, and the case shall be dismissed.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs commenced this action by filing their original complaint on June 21, 1996 in the United States District Court for the District of Massachusetts. On July 18, 1997, the action was transferred to this court. In their original complaint, plaintiffs lodged against the defendants federal statutory claims under sections 8(e), 34(b), 36(a), and 36(b) of the Investment Company Act of 1940 (the "ICA"), and state

common-law claims for breach of fiduciary duty and deceit. On February 23, 1998, on defendants' motion, plaintiffs'. claims under sections 8(e), 34(b), and 36(a) of the ICA were dismissed, leaving only their claim under section 36(b) of the ICA. *See Green v. Fund Asset Mgmt., L.P.,* 19 F.Supp.2d 227 (D.N.J.1998) ("*Green* "). In the wake of this disposition, plaintiffs filed an amended complaint, without leave of court, on March 31, 1998.[1]

On June 14, 1999, on defendants' motion for judgment on the pleadings, plaintiffs' state-law claims were dismissed on the ground that they were preempted by section 36(b) of the ICA. *See Green v. Fund Asset Mgmt., L.P.,* 53 F.Supp.2d 723 (D.N.J.1999). On March 16, 2001, this judgment was reversed; the state-law claims were reinstated, and the matter was remanded for further proceedings. *See Green v. Fund Asset Mgmt., L.P.,* 245 F.3d 214 (3rd Cir.2001).

Defendants have now moved for summary judgment on plaintiffs' remaining federal claim under section 36(b) of the ICA, 15 U.S.C. § 80a-35(b) (1940, as amended). Plaintiffs have filed a cross-motion on this claim for partial summary judgment on liability. The state-law claims are not the subject of the instant motions.

As the factual background and procedural history of this case are set forth in *Green,* only those undisputed facts and disputed factual allegations necessary to disposition of these motions shall be recited here. All recitations of fact are undisputed unless otherwise noted.

---

1. Though plaintiffs did not obtain leave of court or the defendants' written consent prior to filing their amended complaint, as required by Rule 15(a) of the Federal Rules of Civil Procedure, defendants have answered the amended complaint, and both defendants and plaintiffs have moved for summary judgment on the section 36(b) claim set forth therein. The amended complaint shall therefore be considered to have been properly filed and to be operative.

### Purpose and Operation of the Funds

Plaintiffs own common stock in the seven defendant non-diversified, closed-end management investment companies (the "funds"). The funds are non-diversified in that their investment assets consist largely, if not entirely, of "obligations issued by or on behalf of states, territories and possessions of the United States and their political subdivisions, agencies or instrumentalities paying interest which, in the opinion of bond counsel to the issuer, is exempt from federal income taxes ('municipal bonds')." Prospectus, MuniVest Fund II, Inc., 3/19/93, Exhibit B to Declaration of Sean M. Murphy in Support of Defendants' Motions for Summary Judgment, at 10 (initial capitals changed to lowercase).[2] The funds are closed-end in that they do not redeem their securities at the option of their shareholders, and do not engage in continuous stock offerings. Prospectus at 9. The funds are registered under the ICA. *Ibid.* Each fund's goal is providing "shareholders with as high a level of current income exempt from federal income taxes as is consistent with its investment policies and prudent investment management." *Id.* at 10; *accord* Am. Compl. ¶ 31, at 9.

■ An essential feature of the funds' operation is leverage. Ordinarily, the term "leveraged" is used to describe investments made with a given amount of capital and a given amount (often a larger amount) of borrowed funds. *See* BLACK'S LAW DICTIONARY 906 (6th ed.1990). However, leverage is also used to describe "[t]he effect on common stockholders of the requirements to pay bond interest and preferred stock dividends before payment of common stock dividends," *ibid.*, and it is in this connection that the term is used to describe the funds' operation.

Common stockholders in the funds have provided the main corpus of capital with which the funds have purchased long-term municipal bonds for their portfolios. In lieu of borrowing funds at standard market interest rates, ranging typically from six to eight percent (6%—8%), in order to purchase additional municipal bonds, the funds have issued shares of preferred stock that pay, on a monthly basis, dividends at rates equal to short-term interest rates, ranging typically from two and one-half to four percent (2½%—4%). Investors are willing to purchase preferred stock paying such low dividend rates chiefly because the funds' asset portfolios consist in the main of municipal bonds exempt from federal income taxation, and so the preferred stock dividends are also exempt from federal income taxation. Defs.' Statement Undisputed Material Facts ¶ 34, at 8.[3] The funds have used the proceeds from their issues of preferred stock, purchased by investors, to purchase additional municipal bonds.[4]

---

**2.** The MuniVest Fund II prospectus is an exemplar; the parties do not dispute that the prospectuses for the other six funds contain provisions identical or equivalent, in all material respects, to the provisions of the MuniVest Fund II prospectus. *See* Defs.' Resp. Pls.' Statement Undisputed Material Facts ¶ 62, at 28; ¶¶ 66–67, at 30–31.

**3.** However, as defendants' counsel explained at oral argument, such investors generally do not want to make such investments in the long term at such low (albeit federally tax-free) interest rates. Thus, the funds oversee

weekly auctions at which those wishing to buy, sell, or hold onto shares of preferred stock in the funds bid on the dividend rates for the coming week. These weekly auctions allow the funds to pay dividends to preferred shareholders at the lowest prevailing market interest rates, which, as will be seen, maximizes the yield to common shareholders in the funds.

**4.** In their briefs and at oral argument, plaintiffs' counsel used loose terminology demonstrating considerable confusion about the funds' operation and basic accounting princi-

The use of leverage furthers the funds' stated goal of providing investors with income exempt from federal income taxation. Under normal market conditions, securities with longer maturities, such as these long-term municipal bonds, produce higher yields than do short-term securities, such as the preferred stock. The spread between the dividend rates payable on the preferred stock and the coupon rates on the long-term municipal bonds provides common shareholders with a higher yield than they would have realized had the funds not been leveraged with issues of preferred stock. Prospectus, Ex. B. to Murphy Decl., at 17.

As the funds have made abundantly clear to potential investors, leverage, like investment itself, has its risks. The funds are non-diversified: the vast majority of the funds' assets consists of large positions taken in the municipal bonds of a small number of issuers. *See* Prospectus at 12 (explaining non-diversified status under the ICA and the Internal Revenue Code). The municipal bonds are long-term, fixed-coupon instruments; accordingly, they pay interest periodically to investors at a fixed percentage of the principal amount, and then yield the principal upon maturity. For this reason, if long-term interest rates rise above the municipal bonds' fixed-coupon rates, the market value of the bonds decreases, and the bonds trade at a discount. When this happens, the impact of the reduction in the bonds' market value is felt more acutely by the common shareholders than if the funds held a smaller dollar amount in bonds or if the funds' asset portfolios were more diversified. Prospectus at 17, 18. This results in a corresponding reduction in the net asset value, with a likely reduction in market value, of the common stock. *Id.* at 18.

If short-term interest rates rise more steeply than do long-term interest rates, the positive yield curve created by the spread between short-term and long-term rates flattens; if short-term rates exceed long-term rates, the yield curve becomes inverted. In this case, this means that as short-term interest rates rise relative to long-term interest rates, the dividend rate paid on the outstanding shares of preferred stock increases, while the fixed-coupon rate on the bonds remains the same. As the yield curve flattens, the benefit of leverage reflected in the return to common shareholders is reduced. *Ibid.* If short-term rates exceed long-term rates—if the dividend rate paid on the preferred stock exceeds the fixed-coupon rate on the bonds—then the inverted yield curve results in a lower rate of return to the common shareholders than if the funds had not been leveraged. *Ibid.*

The prospectus defines net asset value per share of common stock in a fund as the value of the securities held by the fund,

---

ples. It is appropriate to dispel this confusion at this point.

Plaintiffs repeatedly refer only to the municipal bonds purchased with the proceeds from issues of preferred stock as "leverage" or "leveraged assets." This is inaccurate. Leverage is an investment tool, not a category of assets. All of the assets in the funds' portfolios, including municipal bonds purchased with the proceeds from issues of preferred stock, are leveraged.

Plaintiffs repeatedly treat the preferred stock and the assets purchased with the proceeds from issues of preferred stock as one and the same. This violates basic principles of accounting. Shares of preferred stock are assets of the stockholders, not of the funds.

Plaintiffs repeatedly urge that the funds' obligations to preferred stockholders should be treated as liabilities of the funds. This is at odds with generally accepted accounting principles, according to which the funds carry their obligations on preferred stock on their books as capital, not as liabilities. Defs.' Statement Undisputed Material Facts ¶ 42, at 10.

plus any cash or other assets, including interest accrued but not yet received, minus all liabilities, including accrued expenses, and the aggregate liquidation value of the outstanding shares of preferred stock, all divided by the total number of outstanding shares of common stock. Prospectus at 30. By contrast, the prospectus defines net asset value per share of preferred stock in a fund as the original purchase price per share plus accumulated dividends per share. *Id.* at 31. The common shareholders pay all costs and fees associated with managing the funds, including the costs associated with the issuance of preferred stock and its weekly auctioning on the secondary market. *Id.* at 18; *accord* Am. Compl. ¶ 68, at 21. Further, the funds will declare a dividend to common shareholders if and only if all accumulated preferred stock dividends have been paid. *Id.* at 24. These hierarchical distinctions between preferred and common stock accentuate the impact of reductions in the market value of the municipal bonds.

### Advisory Compensation Agreements

The funds are managed by defendant investment advisors Fund Asset Management, L.P. and Merrill Lynch Asset Management, L.P. (collectively, "the advisors"). The prospectus specifies that the funds will pay the advisors for their investment management services a monthly fee of one-half of one percent (0.50%) of the funds' average weekly net assets. Prospectus at 22; *accord* Am. Compl. ¶ 37, at 11. "Average weekly net assets" are defined in the prospectus as "the average weekly value of the **total assets of the fund**, minus the sum of accrued liabilities of the fund and accumulated dividends on the shares of preferred stock." *Ibid.* (initial capital omitted, emphasis added). In at least one of the investment advisory agreements struck between the funds and the advisors

(all of which agreements are on file with the Securities and Exchange Commission), "average weekly net assets" are further defined by exclusion: "[i]t is understood that the liquidation preference of any outstanding preferred stock (other than accumulated dividends) is not considered a liability in determining the fund's average weekly net assets." Investment Advisory Agreement between Munivest Fund II, Inc. and Fund Asset Management, Inc., 3/17/93, Ex. C to Murphy Decl., at 7. This is in keeping with generally accepted accounting principles. *See supra* note 4.

It is worth noting at this juncture the key accounting distinction between the funds' assets and their capital. As noted above, *see supra* page 325, the net asset value per share of common stock in the funds equals the funds' assets minus the sum of their liabilities and the aggregate liquidation value of the outstanding shares of preferred stock. This is the common shareholders' equity in the funds; this is also part of the funds' investment capital. *See* Annual Report of Munivest Fund II, Inc. for Fiscal Year Ending October 31, 1994, Statement of Assets, Liabilities and Capital, Ex. D to Murphy Decl., at 10. By contrast, the net assets of the funds, upon which the advisors' fee is calculated, equal the funds' assets minus the sum of the funds' accrued liabilities and the accumulated dividends on shares of preferred stock. *See ibid.*

### DISCUSSION

The plaintiffs have plethorically briefed a welter of issues and advanced many arguments, but their case under section 36(b) of the ICA boils down to two claims: (i) the funds failed adequately to disclose that the municipal bonds purchased with the proceeds from the issuance of preferred stock are taken into account in determining the advisors' fees; and (ii) the

advisors have taken their fees in the face of a conflict between their interests and the funds' that amounts per se to a breach of fiduciary duty. Neither of these claims has merit.

### Section 36(b) of the ICA

In 1970, Congress recognized that the interests of investment company advisors whose fees are based upon the quantum of assets in their advisee investment companies' portfolios are in potential conflict with the interests of those investment companies. S.REP.No. 91–184 (1970), *reprinted in* 1970 USSCAN 4897, 4898.[5] With this in mind, Congress enacted section 36(b) of the ICA.

Section 36(b) makes it clear, "as a matter of Federal law," that investment company advisors owe shareholders in investment companies a fiduciary duty in determining and receiving their advisory fees. *Id.* at 4898, 4902. "[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." ICA § 36(b), 15 U.S.C. § 80a–35(b).

A shareholder in an investment company may bring suit under section 36(b), on behalf of such company, for breach of fiduciary duty in respect of such compensation. *Ibid.* "No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or

payments." 15 U.S.C. § 80a–35(b)(3). In any such action, approval of an investment compensation agreement or arrangement by an investment company's directors, or ratification of such an agreement or arrangement by an investment company's shareholders, "shall be given such consideration by the court as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a–35(b)(2). Any award of damages shall be limited to the actual damages resulting from the breach of fiduciary duty, and shall in no event exceed the amount of compensation or payments received; and no award of damages shall be recoverable for any period prior to one year before the action was instituted. 15 U.S.C. § 80a–35(b)(3). Finally, "plaintiff shall have the burden of proving a breach of fiduciary duty." 15 U.S.C. § 80a–35(b)(1).

### Plaintiffs' Claims under Section 36(b) of the ICA

Plaintiffs expressly stated in their briefs and at oral argument that they do not allege the advisors' compensation was excessive. *E.g.* Pls.' Mem. Supp. Mot. Partial Summ. J. at 4. Rather, plaintiffs allege that taking into account the municipal bonds purchased with the proceeds from sale of preferred stock in determining advisory fees creates an actual conflict of interest between the advisors and the funds; that the advisors' supposed failure adequately to have disclosed this conflict to the funds or their common shareholders amounts to an actionable breach of fiduciary duty; and that the conflict itself is per se an actionable breach of fiduciary duty. *See* Am. Compl. ¶ 95, at 30. Plaintiffs seek to hold the funds, the advisors, and two individual officers of the funds and the advisors, Arthur Zeikel and Terry Glenn

---

**5.** At oral argument, plaintiffs' counsel declared the existence of a potential conflict of interest, as opposed to an actual conflict of

interest, to be impossible. Congress would disagree.

(collectively, "the officers"), liable for those advisory fees attributable to the additional municipal bonds purchased with the proceeds from the issuance of preferred stock. Plaintiffs have moved for partial summary judgment establishing the advisors and the officers' liability to the plaintiffs; plaintiffs have conceded that the funds cannot be held liable under section 36(b) of the ICA. Pls.' Opp'n Individual and Fund Defs.' Mots. Summ. J. at 7.

Defendants oppose plaintiffs' motion, and move for summary judgment in their favor. Defendants contend that plaintiffs lack constitutional and statutory standing to press their claims; that plaintiffs have misconstrued section 36(b) of the ICA; that there was no failure adequately to disclose the method of calculating the advisors' fees; that the officers cannot be held liable to the plaintiffs because they did not receive compensation or payments from the funds; and that the advisors did not breach their fiduciary duty to the funds and their shareholders. These contentions shall be addressed seriatim.

### Standing

■ The issue of standing, at least in its constitutional dimension, must be considered before assaying the merits of the parties' motions for summary judgment. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III [of the United States Constitution]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The irreducible constitutional minimum of standing contains three elements: injury in fact, causation, and redressability. *Lujan*, 112 S.Ct. at 2136. Injury in fact is an invasion of a legally protected interest that is concrete and particularized, and actual

or imminent. *Ibid.* Causation means that the injury complained of is fairly traceable to the defendant's conduct. *Ibid.* Redressability means that the injury will likely be remedied by a favorable decision. *Ibid.*

Defendants contend that plaintiffs lack constitutional standing to press their claims because they have not alleged, and cannot prove, actual injury. More specifically, defendants contend that because the plaintiffs have seen positive—and, in defendants' words, handsome-overall returns and yields on their investments in the funds from 1995 through the present, plaintiffs have suffered no damage, and cannot complain about the payment of advisory fees.

Defendants' contention is unavailing. Irrespective of how well (or, at certain times, how poorly) the funds have performed for the common shareholders, it is clear that plaintiffs will be entitled to recover at least some of the advisory fees if those fees were paid to the advisors in violation of the advisors' fiduciary duty to the funds and their shareholders, and if the plaintiffs can meet the other conditions set forth in section 36(b) of the ICA. Though statutory standing and constitutional standing are separate doctrines, here they are coextensive. Plaintiffs have, in the first instance, the legal right to recover from investment advisors whose compensation violates the advisors' fiduciary duty to the funds and their shareholders. If plaintiffs were to meet their burden of showing a breach of fiduciary duty (the contours of which will be limned shortly), it would flow that at least some, if not all, of the advisory fees would be recoverable under section 36(b). *See Green*, 19 F.Supp.2d at 235. Thus, the injury would be fairly traceable to the advisors' conduct, and would be remedied by an award of money damages under section

36(b). The plaintiffs have standing to press their claims.

### Summary Judgment

A motion for summary judgment shall be granted only if there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Material facts are those that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue exists if the record taken as a whole could lead a rational trier of fact to find for the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In disposing of a motion for summary judgment, it is not the province of the trial court to weigh the evidence and to decide the case on its merits; rather, the trial court shall simply determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. In determining whether there is a genuine issue for trial, the trial court must take the nonmovant's allegations of fact as true, *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3rd Cir.1976), and resolve all doubts and make all reasonable inferences in the nonmovant's favor, *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 631 (3rd Cir.1998). Credibility determinations are not to be made on motions for summary judgment. *Abraham v. Raso*, 183 F.3d 279, 287, 294 (3rd Cir. 1999).

These standards for disposing of a motion for summary judgment remain unchanged when a court is faced with cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3rd Cir.1987). However, if review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment under the law and the undisputed facts. *Iberia Foods Corp. v. Romeo Jr.*, 150 F.3d 298, 302 (3rd Cir.1998).

### Construction of Section 36(b) of the ICA

Defendants claim the plaintiffs have misconstrued section 36(b) of the ICA. They are correct. Both in their briefs and at oral argument, plaintiffs repeatedly asserted that this court found and held in *Green* that the advisors had breached their fiduciary duty to the funds and their shareholders, and that it therefore somehow devolved upon the defendants to justify their actions. This is lawyerly embroidery upon the fabric of a published judicial decision. Nowhere in *Green* did this court reallocate the traditional burdens of production and persuasion; nowhere in *Green* did this court reallocate the specific, express burden imposed upon the plaintiffs by section 36(b) of proving a breach of fiduciary duty; and nowhere in *Green* did this court find or hold that any defendant had indeed breached a fiduciary duty. In fabricating this assertion out of whole cloth, plaintiffs ignore the plain language of section 36(b): "plaintiff shall have the burden of proving a breach of fiduciary duty." 15 U.S.C. § 80a–35(b)(1).

Plaintiffs have further misconstrued section 36(b) of the ICA in assuming that state-law fiduciary-duty doctrines developed in the areas of corporate law and trusts have been incorporated or imported into section 36(b). This is not so. As a matter of federal statutory law, Congress has declared in section 36(b) that investment company advisors owe shareholders in investment companies a fiduciary duty in determining and receiving their advisory fees. Though the scope and particulars of this duty will of course be fleshed out by

the courts as they develop federal common law on this subject, the fiduciary duty imposed upon investment advisors by section 36(b) is not inflected by state corporate or trust law. *See Tannenbaum v. Zeller*, 552 F.2d 402, 416 (2nd Cir.1977), *cited and followed in Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 37 F.Supp.2d 256, 261 (S.D.N.Y.1999).[6]

### Disclosure of Method of Calculating Advisory Fees

■ Plaintiffs allege that the advisors have breached their fiduciary duty to the funds and their shareholders by failing adequately to disclose that the municipal bonds purchased with the proceeds from the funds' issuance of preferred stock are taken into account as assets in determining the advisory fees. This allegation is frivolous. The prospectus specifies that the funds will pay the advisors for their investment management services a monthly fee of one-half of one percent (0.50%) of the funds' average weekly net assets. Prospectus, Ex. B to Murphy Decl., at 22. The prospectus then immediately defines average weekly net assets as "the average weekly value of the **total assets of the fund,** minus the sum of accrued liabilities of the fund and accumulated dividends on the shares of preferred stock." Prospectus at 22 (initial capital omitted, emphasis added). "Total" means "comprising or constituting a whole; entire; absolute, utter." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1246 (1983). The phrase "total assets of the fund" is susceptible of only one reading: it means **all** the assets of the fund, including, of course, those municipal bonds purchased with the proceeds from the funds' issuance of preferred stock. That the investment advisory agreement contains additional language, *see supra* pages 325–26, is of no moment; the meaning of the word "total" is nose-face plain.

### The Officers Cannot Be Held Liable under Section 36(b) of the ICA

■ Defendants have submitted the sworn declaration of Donald C. Burke ("Burke"), First VicePresident of Merrill Lynch Investment Managers and Treasurer of the funds, in which he states that the officers received no payments or compensation from the funds from 1994 through 1996. Burke Decl., 2/5/01, ¶ 3, at 2. Defendants further stated at oral argument that the officers have never received payment or compensation from the funds. Though plaintiffs nominally dispute this sworn allegation, *see* Pls.' Resp. Defs.' Statement Material Facts ¶ 28, at 19–20, in reality their disputation is purely legal: because the officers received salary payments from the funds, plaintiffs argue, the officers in-

---

**6.** It is true that section 36(b) was "not designed to ignore concepts developed by the courts as to the authority and responsibility of directors." S.REP.No. 91–547, *reprinted in* 1970 USSCAN 4897, 4903. The remainder of this passage makes it clear, however, that section 36(b) was designed to strengthen the ability of unaffiliated directors to gauge the propriety of advisory conduct, "and to provide a means by which the Federal courts can effectively enforce the **federally-created fiduciary duty** with respect to management compensation." *Ibid.* (emphasis added). Section 36(b) was "not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary," *ibid.*, and "was not enacted to provide a cause of action ... to govern the directors' independence or the investment adviser's general performance." *Migdal v. Rowe Price–Fleming Int'l Inc.*, 248 F.3d 321, 327–29 (4th Cir. 2001).

Taken in context, then, this statement from the legislative history of section 36(b) means that the courts are not charged with the task of managing investment companies; it does not mean that Congress intended to incorporate state-law fiduciary-duty precepts into section 36(b).

directly received advisory compensation recoverable under section 36(b) of the ICA.

Congress took great pains to specify who may be held liable and from whom damages may be recovered under section 36(b). "No such action shall be brought or maintained against any person other than the recipient of such [advisory] compensation or payments [of a material nature], and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments." 15 U.S.C. § 80a–35(b)(3). Though recovery may be had from affiliates of investment advisors, see 15 U.S.C. § 80a–35(b), "[t]his provision affords a remedy if the investment adviser should try to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser." S.Rep.No. 91–184 (1970), reprinted in 1970 USSCAN 4897, 4910–11. Plaintiffs do not allege that the advisors have tried to evade liability under section 36(b) by arranging for advisory fees to be paid to the officers instead of the advisors; plaintiffs simply allege that the officers must have received advisory compensation or payments of a material nature because they were paid salaries by the advisors. As a matter of law, this is insufficient to make the officers recipients of compensation or payments so as to subject them to liability under section 36(b). See Tarlov v. Paine Webber Cashfund, Inc., 559 F.Supp. 429, 441 (D.Conn. 1983) (construing recipiency strictly under § 36(b), and dismissing pendent state-law claims against investment funds and their affiliated and independent directors because those parties could not be held liable under § 36(b)).

## The Advisors Did Not Breach Their Fiduciary Duty to the Funds or to the Shareholders

 As noted above, see supra pages 327–28, the federally created fiduciary duty imposed by Congress upon investment advisors in section 36(b) is not imbued by state corporate-law or trust-law fiduciary-duty doctrine. It remains to describe the advisors' fiduciary duty to the funds and their shareholders concerning advisory fees, and to determine whether the advisors' collected their fees in violation of that duty.

 The paradigmatic claim under section 36(b) is for recovery of excessive advisory fees. Indeed, the United States Courts of Appeals for the Second Circuit and the Fourth Circuit limit section 36(b) claims to those for recovery of excessive fees, and predicate recovery upon a showing that an investment advisor received a fee "so disproportionately large that it bears no reasonable relationship to the [advisory] services rendered and could not have been the product of arm's-length bargaining." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2nd Cir.1982), quoted and followed in Migdal, 248 F.3d 321, 325–26, 327–29. This court, by contrast, took a broader view in Green, and held that section 36(b) "is not expressly limited to situations in which the advisory fees received by an investment adviser were excessive, disproportionate or otherwise unreasonable." Green, 19 F.Supp.2d at 234 (declining to follow Gartenberg), quoted and followed in Krantz v. Prudential Investments Fund Mgmt. LLC, 77 F.Supp.2d 559, 565 (D.N.J.1999) (per Hayden, J.), and followed in Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 491 (N.D.Ill.1999).[7] Therefore, plaintiffs' waiver of a claim against the advisors for ex-

---

**7.** The plaintiff in the instant case, Jack Green, is the plaintiff in Green v. Nuveen Advisory

Corp. Accordingly, that case shall hereinafter be cited as "Nuveen."

cessive fees does not preclude the possibility of plaintiffs' prevailing under section 36(b).

 Plaintiffs argue that the advisors' failure ever to have "deleveraged" the funds, i.e. to have sold municipal bonds in order to redeem shares of preferred stock in times of high short-term or long-term interest rates, means the advisors have mismanaged the funds and received fees on too great a corpus of assets. But plaintiffs have expressly waived any claim that the advisors' fees were excessive; and to the extent they allege mismanagement, their claim is not cognizable under section 36(b). *Migdal,* 248 F.3d at 327–29, *quoted supra* note 6.

Plaintiffs' sole remaining refuge is the argument that the advisors received their compensation from the funds in the face of an actual conflict between their interests and the funds and shareholders' interests that is a per se breach of fiduciary duty. This argument fails.

 Plaintiffs do not dispute that "virtually all of the more than 200 tax-exempt leveraged closed-end bond funds that leverage using preferred stock calculate their fees based on net assets, including the assets purchased with the proceeds from the sales of preferred stock." Defs.' Statement Undisputed Material Facts ¶ 45, at 10–11; Pls.' Resp. Defs.' Statement Undisputed Material Facts ¶ 45, at 24. If the potential conflict between the advisors' interest and the funds and shareholders' interests that motivated Congress to enact the carefully calibrated provisions of section 36(b) automatically rose per se to the level of a breach of fiduciary duty, then every investment advisory compensation agreement or arrangement would be invalid. Surely Congress did not intend this absurd result.

 Even if basing the advisors' fees upon the funds' total assets (including by definition the municipal bonds purchased with the proceeds from the funds' issuance of preferred stock) brings the advisors' interests into actual conflict with the funds and shareholders' interests, this alone, without more, is not per se a breach of fiduciary duty. Though there are no cases directly in point decided under the ICA, instructive and persuasive in this regard is *Friend v. Sanwa Bank Cal.,* 35 F.3d 466 (9th Cir.1994), decided under the Employee Retirement Insurance Security Act of 1974 ("ERISA"). Section 404(a)(1)(A)(i) of ERISA requires the fiduciary of an employee welfare or pension benefit plan to "discharge his duties with respect to a plan solely in the interest of the [plan] participants and beneficiaries and … for the exclusive purpose of providing benefits to participants and their beneficiaries." ERISA § 404(a)(1)(A)(i), 29 U.S.C. § 1104(a)(1)(A)(i) (1974, as amended), *quoted in Friend,* 35 F.3d at 468. Though the language of section 404(a) of ERISA apodictically imposes upon plan fiduciaries an express fiduciary duty of undivided loyalty to plan participants and beneficiaries—an express fiduciary duty not imposed upon investment advisors by section 36(b) of the ICA—the United States Court of Appeals for the Ninth Circuit, speaking through Judge O'Scannlain, held that a fiduciary bank "does not commit a per se violation of section 1104(a)(1) by the mere act of becoming a trustee with conflicting interests." *Friend,* 35 F.3d at 469. If an actual conflict of interest does not per se amount to a breach of the express fiduciary duty of undivided loyalty imposed by ERISA, then *a fortiori* an actual conflict between the advisors' interests and the funds and shareholders' interests does not per se amount to a breach of the more

generic fiduciary duty imposed by the ICA.

▮ Plaintiffs' also do not dispute that each year since the funds were created, their boards of directors, including the disinterested directors required under the ICA to sit on those boards,[8] have reconsidered and approved the funds' advisory compensation agreements. Pls.' Statement Undisputed Material Facts ¶ 49, at 11; Defs.' Resp. Pls.' Statement Undisputed Material Facts ¶ 49, at 25. The approval of an investment compensation agreement or arrangement by an investment company's directors "shall be given such consideration by the court as is deemed appropriate under all the circumstances," 15 U.S.C. § 80a–35(b)(2). In this case, such undisputed approval militates strongly against the contention that the advisors have breached their fiduciary duty to the funds or their shareholders.[9]

▮ In sum, under the law and on the undisputed facts, plaintiffs have not met and cannot meet their burden under section 36(b)(1) of proving the breach of a fiduciary duty. As plaintiffs have no arrows left in their quiver,[10] summary judgment shall be granted in favor of the defendants on plaintiffs' claim under section 36(b) of the ICA.

### Dismissal of the State–Law Claims

▮ This court may decline to exercise supplemental jurisdiction over the state-law claims recently reinstated by the United States Court of Appeals for the Third Circuit where it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3) (1990). This court's rendition of summary judgment in defendants' favor on plaintiffs' claim under section 36(b) of the ICA—the sole remaining claim over which this court had original jurisdiction under 28 U.S.C. § 1331— amounts to a dismissal under section 1367(c)(3). See Hedges v. Musco, 204 F.3d 109, 112, 122–24 (3rd Cir.2000). Indeed, under binding Third Circuit precedent, this court must decline to exercise supplemental jurisdiction over the plaintiffs' state common-law claims for breach of fiduciary duty and deceit "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Hedges, 204 F.3d at 123 (quoting Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 788 (3rd Cir. 1995)). No such considerations inhere in this case. It is distinctly possible that Maryland state law may govern these state-law claims; see Prospectus, Ex. B. to Murphy Decl., at 35 (adverting to advice of counsel on matters of Maryland law). The plaintiffs may therefore wish to file a new

8. See Migdal, 248 F.3d at 329 (providing a succinct yet complete explanation of the various provisions of the ICA governing disinterested directorships).

9. Plaintiffs' contention that taking total assets into account in determining advisory fees creates an unhealthy, self-directed incentive in the advisors to maintain maximum leverage on the funds' assets, and so results in a breach of fiduciary duty or an actual conflict of interest, is further undermined by the plaintiffs' failure to allege violation of the provisions of the ICA requiring asset coverage of at least two hundred percent (200%) when the preferred stock (a "senior security" under

the ICA) is issued, sold, or is to pay a dividend to preferred shareholders. See 15 U.S.C. § 80a–18(a)(2)(A), (B), (b).

10. Plaintiffs sketched the outline of a claim in their amended complaint against defendant Merrill Lynch, Pierce, Fenner & Smith, Inc., who they allege received service fees and "collateral revenues" from the weekly auctions of issued preferred stock in violation of section 36(b). Plaintiffs made no mention of this adumbrated claim in their briefs or at oral argument. These fees are neither compensation nor payments of a material nature under section 36(b), and so cannot be recovered thereunder. Nuveen, 186 F.R.D. at 492.

complaint alleging breach of fiduciary duty and deceit in a Maryland state court; certainly, this court is not expert in matters of Maryland law. Regardless of where plaintiffs file a new complaint if they choose to do so, their claims will not be time-barred, for any applicable state statutes of limitation have been tolled during the pendency of this case and will be tolled for thirty (30) days after the claims have been dismissed by this court (unless applicable state law provides a longer period). 28 U.S.C. § 1367(d), *discussed in Hedges*, 204 F.3d at 123–24. If plaintiffs wish to pursue their state-law claims against the defendants, they must do so in state court.

CONCLUSION

In *Green*, this court declined to grant judgment on the pleadings on plaintiffs' claim under section 36(b) of the Investment Company Act of 1940 because determining whether the advisors' fee arrangement constitutes a per se breach of fiduciary duty required "an exploration of the economic realities of [the] funds and market circumstances and practices." *Green*, 19 F.Supp.2d at 235. The court awaited the making of a record "either on a summary judgment motion or at a trial." *Ibid.* Based on the law, and on the undisputed facts developed on this record, plaintiffs cannot prevail on their claim under section 36(b) of the ICA. Summary judgment shall therefore be entered in the defendants' favor, and the plaintiffs' remaining state-law claims shall be dismissed. An appropriate order shall enter.